**EPSTEIN & WEIL LLC**
ATTORNEYS AT LAW

225 Broadway
New York, NY 10007

(212) 732-4888

**LLOYD EPSTEIN**
**JUDITH H. WEIL**

August 9, 2018

**VIA ECF and REGULAR MAIL**
Hon. Edward R. Korman
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

Re: **United States v. Saul Rendon-Reyes**
Dkt. No. 15-CR-348 (S-1) (ERK)

Dear Judge Korman:

Saul Rendon-Reyes never wanted to be a sex trafficker. Although born and raised in Tenancingo, Mexico, perhaps North America's sex-trafficking capital, he worked hard to become a barber and a car mechanic in Mexico, but failed because of his cognitive deficits and lack of training. Later, he worked as a delivery man in fish and produce shops in Brooklyn and Chinatown. Mr. Rendon-Reyes is illiterate and was often beaten and ridiculed as a child. Although his father, an alcoholic, warned him of the dangers of sex-trafficking, it became all too easy Mr. Rendon-Reyes to fall in with his extended family and join their sex-trafficking ring.

Mr. Rendon-Reyes recognizes that none of this excuses his crimes. He recognizes that his conduct was brutal, exploitative, and cruel. He is ashamed and recognizes that he must be severely punished.

Mr. Rendon-Reyes is scheduled to be sentenced by the Court on September 13, 2018 on his pleas of guilty to Racketeering in violation of 18 U.S.C. §1962(c) and Sex Trafficking in violation of 18 U.S.C. §1591(a)(1) & (b)(1). The Sex Trafficking conviction carries a mandatory minimum fifteen year (180 months) sentence of incarceration.

The plea agreement calculates a Sentencing Guideline range of 168 to 210 months while the Presentence Report ("*PSR*") calculates a range of 151-188 months. Under either calculation, the statutory mandatory minimum sets the Guideline minimum sentence at 180 months.

I respectfully request that the Court impose the statutory minimum sentence of 180 months. This sentence will severely punish Mr. Rendon and satisfy all of 18 U.S.C. §3553(a)'s sentencing criteria.

I annex as Exhibit A a psycho-social report concerning Mr. Rendon-Reyes prepared by Dr. Simone Z. Gordon, D.S.W. (the "*Gordon Report*"). The first section of the report summarizes the history and sociology of the sex trafficking industry in Tenancingo. The second section details Mr. Rendon-Reyes' cognitive deficits, the abject poverty into which he was born, his thwarted efforts at legitimate employment, and the social forces which led him into the sex trafficking industry.

*Saul Rendon-Reyes Is Ashamed of Beating "Jane Doe-2"*

Saul looked at his fists. He had just stopped beating "Jane Doe-2" (*PSR* ¶24). He wasn't sure why he became enraged. He wasn't sure why he suddenly started beating her. "Jane Doe-2" had agreed to "work" even though she had just given birth. She came home with money every night. Yes, she was late tonight, but that only meant that she was working more.

Saul, who spent many of his nights drinking, couldn't understand why he became so angry. He couldn't understand why he beat her, slammed her head into the wall, and continued to beat her after she fell to the floor.

Saul himself, as a child, was beaten many times by his drunken father. Saul could still remember the pain and see, or imagine, that he was seeing, welts on his face and back (*Gordon Report*, p. 8). Saul learned to deal with the beatings by trying to forget about them. Otherwise, he would think about them at night and couldn't sleep.

Saul tried to forget about beating "Jane Doe-2." He began working more hours in the Chinatown fish market (PSR ¶132; *Gordon Report,* pp. 14, 16). He talked less to his brother and cousins. "Jane Doe-2" was still his prostitute, but he was almost happy when she escaped (*PSR* ¶24). Beating her still bothered him.

After Saul was arrested, he remembered that his father always warned him about the extended family's sex-trafficking ring. Eventually everyone, his father warned, would be arrested and sent to prison (*Gordon Report*, p. 10). Saul never liked listening to his father. Whenever Saul thought about his father, all he could think about were the beatings and the years his father forced him to rummage in garbage dumps for food and trinkets. Saul cringed when he remembered how his father sent him to school with clothes that stunk of garbage, and how the other children laughed (*Gordon Report*, p. 9).

Hon. Edward R. Korman
August 9, 2018
Page 3

Saul never gave much thought to how he fell into the sex-trafficking business. He couldn't find work as a barber or a laborer, and needed money. He was talking to his brothers and cousins, and it just happened. When Saul worked with his cousins in Georgia and Alabama, he would drive the prostitutes from customer to customer (*PSR* ¶33; *Gordon Report*, p. 14). It almost felt like a real job. But whenever he thought about "Jane Doe-2," how he beat her, and how he threatened others, he was ashamed. He knew his father was right, and he knew that he deserved to be punished.

*Mr. Rendon-Reyes is Illiterate and Cognitively Impaired.*

Saul didn't understand why the two women were asking him so many questions. His lawyer told him that one was a probation officer working for the court, the other a social worker working for the lawyer, but he really couldn't understand why they were asking so many questions. His lawyer told him that the questions were important, that he should answer them honestly, and that judge wanted as much information as possible. Saul couldn't grasp why anyone cared whether he could read. Everyone knows that he can't read or write. Why did everyone want to know why he was thrown out of school in the first grade, and why he never went back? (*PSR*, ¶121; *Gordon Report*, p. 16). Why were people so interested in the fact that he grew up in a "paper" house without a roof, or that at six or seven he spent most of his time with his parents rummaging through garbage dumps for food and trinkets, or that he was forced to care for the younger children when his parents worked? (*PSR* ¶121; *Gordon Report*, p. 16). Why did it matter that he tried to make a living as a barber and as a car mechanic in Mexico and that his efforts were destroyed by family members who took advantage of him? (*PSR* ¶134; *Gordon Report*, p. 10, 13). Why did it matter how he got involved in the sex-trafficking scheme? He was guilty.

Saul tried to answer the questions, but some of them were too hard and there were a lot of things he didn't remember. His life was the way it was. What was there to talk about?

Dr. Gordon has tentatively diagnosed Mr. Rendon-Reyes as suffering from cognitive deficits which are organic in nature. These deficits may have been exacerbated by environmental factors, the most important of which is the complete lack of any significant formal education, much less any special education (*Gordon Report*, pp. 9, 15).

My own experience and interactions with Mr. Rendon-Reyes tend to confirm Dr. Gordon's diagnosis. It may well be the severe beatings Mr. Rendon-Reyes experienced as a child have resulted in brain injury that contributed to his cognitive deficits, but given the posture of the case, I have not requested CJA funds for neuropsychological testing.

*The PSR and the Guidelines*

Mr. Rendon-Reyes and I have reviewed the PSR and have no objection to its factual recitation.

The PSR's Guideline calculations are somewhat different from those included in the plea agreement. I have discussed this with Benjamin J. Hawk, the Justice Department attorney working with AUSA Merkyl and AUSA Lee on this matter. My conclusion is that the calculations contained in the plea agreement are correct with one exception that is probably attributable to a mutual mistake by the parties.

The agreement, in the section entitled "Multiple Count Analysis" (pp. 4-5), adds 1 grouping unit because one of Mr. Rendon's racketeering acts was Money Laundering. This appears to be incorrect. Under U.S.S.G. §2S1.1, cmt. n. 6, a unit should not be added for Money Laundering where the defendant was also convicted of the underlying offense from which the illicit funds were generated. This is the case here, where the laundered money was generated by the underlying offense to which Mr. Rendon-Reyes pled guilty, i.e., sex trafficking as was Mr. Rendon-Reyes here. See, *United States v. Sabbeth*, 277 F.3d 94 (2d Cir. 2002).

This being so, the grouping analysis should only three, rather than four, levels to Mr. Rendon-Reyes' offense level. As a result, his total offense level should be 34 instead of 35, with a concomitant sentencing range of 151- 188 months instead of 168 - 210 months.

*The Court Should Impose a Sentence of 180 Months*

Mr. Rendon-Reyes has never had control over his life.. He was raised in abject poverty by a father who beat him and parents who were completely indifferent to his emotional and intellectual limitations. His childhood was short and difficult. He is illiterate with cognitive deficits that make it unlikely he will ever be able to read. He entered the sex-trafficking conspiracy largely because it was open to him, since the scheme was run by relatives. Mr. Rendon-Reyes' Guidelines are lower than those of virtually all of his co-defendants, a strong indication that he played a lesser role in the scheme. He is ashamed and remorseful about his participation. He will be deported when released from prison.

18 U.S.C. §3553(a) sets forth factors that a court must consider in determining a just sentence. Among these factors are "the nature and circumstances of the offense, and the history and characteristics of the defendant,"and any need for rehabilitation, retribution, or punishment. 18 U.S.C. §3553(a)(2)(D). The "parsimony" clause expressly requires the Court to "impose a sentence sufficient, but not greater than necessary, to comply with . . ."

Hon. Edward R. Korman
August 9, 2018
Page 5

these factors. *Kimbrough v. United States*, 552 U.S. 85, 109-110 ( 2007).

    This Court should impose the statutory mandatory minimum sentence of 180 months. This will be a severe sentence that is "sufficient, but not greater than necessary" to satisfy all of the legitimate goals of sentencing. The severity of this sentence is reflected by the fact that Mr. Rendon-Reyes's advisory Sentencing Guideline range, however calculated, would permit the Court to impose a considerably lower sentence than the mandatory minimum without any need for a departure or variance.

    I thank the Court for its consideration. Please feel free to have your Chambers contact me if you have any questions.

                                        Sincerely,

                                        Lloyd Epstein

LE:pc
Enc.

cc.  AUSA Taryn A. Merkl
     AUSA Margaret Lee
     AUSA Benjamin J. Hawk
     (Via Email and ECF)

     All Counsel
     (Via ECF)